Filed 8/4/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| RUSSIAN RIVERKEEPER et al.,<br><br>    Plaintiffs and Respondents,<br>v.<br><br>COUNTY OF SONOMA,<br><br>    Defendant and Appellant. | A172760<br><br>(Sonoma County Super. Ct. No. SCV-273415) |

In 2023, the County of Sonoma amended its local ordinance regulating approval of groundwater well permits. Russian Riverkeeper and California Coastkeeper Alliance (together, Keepers) challenged the amendments in superior court, arguing that in amending the ordinance Sonoma failed to fulfill its duties under the public trust doctrine and also failed to comply with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA). The superior court agreed with Keepers on both points and issued a writ of mandate, setting aside the amended ordinance. On appeal, Sonoma asks us to reverse.

We conclude Keepers failed to satisfy their burden of showing Sonoma's public trust analysis was arbitrary, capricious, or entirely lacking in evidentiary support, but we agree with the superior court that substantial evidence does not support Sonoma's claimed exemptions from CEQA review. As we will discuss, the distinct burdens of proof and standards of review applicable to each claim require this split. Therefore, we reverse the superior

1

court's determination that Sonoma violated the public trust doctrine but affirm the court's conclusion that Sonoma failed to comply with CEQA.

## BACKGROUND

" 'By the law of nature these things are common to mankind—the air, running water, the sea and consequently the shores of the sea.' " (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 433–434 (*National Audubon*), quoting Institutes of Justinian 2.1.1.)  The public trust doctrine evolved from the concept that "the sovereign owns 'all of its navigable waterways and the lands lying beneath them "as trustee of a public trust for the benefit of the people." ' "[1] (*National Audubon*, at p. 434.)  In California, the public trust doctrine imposes "an affirmative duty" upon the state "to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible." (*Id.* at p. 446.)

The events in this appeal were set in motion by a 2018 Court of Appeal decision, which held that counties, as subdivisions of the state, share the state's "responsibility for administering the public trust." (*Environmental Law Foundation v. State Water Resources Control Bd.* (2018) 26 Cal.App.5th 844, 855, 868 (*Environmental Law Foundation*).)  Specifically, the Third District determined in *Environmental Law Foundation* that "the public trust doctrine impose[d] a fiduciary duty on the County" of Siskiyou to consider the public trust in permitting groundwater wells that impacted navigable waterways (i.e., public trust resources).  (*Id.* at pp. 855, 861.)  To comply with its public trust duties, Sonoma amended its well permitting ordinance; Keepers challenge that amendment in these proceedings.

---

[1] Navigable waters are those "which are capable of being navigated by oar or motor-propelled small craft." (*People ex rel. Baker v. Mack* (1971) 19 Cal.App.3d 1040, 1050; see also Harb. & Nav. Code, § 100 [navigable waters defined].)

## I. Factual Background

In Sonoma, the main stem of the Russian River is considered a navigable waterway protected by the public trust doctrine. (See *Hitchings v. Del Rio Woods Recreation & Park Dist.* (1976) 55 Cal.App.3d 560, 570–571 ["the Russian River from Alexander Valley Bridge to the Del Rio Dam" is "navigable in law"].) The Russian River also serves as a critical habitat to threatened and endangered species like the Central California Coast Coho salmon, the California Costal Chinook salmon, and the Central California Coast steelhead trout (collectively, salmonids). However, "[g]roundwater extraction has the potential to impact groundwater dependent ecosystems" such as those of anadromous salmonids, which "require sufficient water depths . . . in order to reach spawning areas."

Sonoma relies on more than "45,000 water wells, the most per capita in any county in California," to supply water for agriculture, residential, commercial, and industrial users in unincorporated areas. Consequently, between 2017 and 2022, Sonoma issued an average of 320 permits for groundwater wells each year.

Sonoma regulates the "procedures, construction standards and setbacks, destruction, and water treatment" of groundwater wells through Chapter 25B of the Sonoma County Code (Chapter 25B). The 2015 version of Chapter 25B allowed Sonoma to issue groundwater well permits on a "purely ministerial basis," meaning permit applications were "subject to objective codified standards, which, if met, result[ed] in permit."[2] Thus, according to a

---

[2] In 2015, Sonoma amended Chapter 25B to comply with Water Code section 13801, which, in relevant part, requires counties to "adopt a water well . . . drilling and abandonment ordinance" that meets or exceeds certain requirements. (Wat. Code, § 13801, subd. (c).) Sonoma requests we take judicial notice of an earlier version of Chapter 25B, which purportedly

3

report prepared by Sonoma, between 2015 and 2023, Chapter 25B did not "explicitly require consideration of impacts to public trust resources for individual well permits."

In 2023, in response to *Environmental Law Foundation* and an ensuing lawsuit by the California Coastkeeper Alliance, Sonoma amended Chapter 25B in an attempt to comply with its public trust duties.

## A. The Amendment Process

The Sonoma Board of Supervisors (the Board) held its first hearing on potential amendments to Chapter 25B on August 9, 2022. Sonoma staff presented on the public trust doctrine and the proposed amendments, and members of the public, including Keepers, offered comments in response. After the hearing, the Board sought more information and directed staff to coordinate with the relevant governmental agencies and engage in public outreach.

In September 2022, Sonoma released a revised version of the proposed amendments to Chapter 25B for public review and held four outreach meetings to explain the revisions, solicit feedback, and answer questions. On October 4, 2022, Sonoma held a noticed public hearing on the proposed amendments. After the hearing, the Board requested more analysis and

---

demonstrates that Sonoma "had issued well permits on a purely ministerial basis since 1972." Keepers oppose the request because (1) Sonoma did not make the request for judicial notice below, and (2) the 1972 version is not relevant to this appeal. Because Sonoma's groundwater well permitting process in 1972 is not relevant to this appeal, we deny the request for judicial notice. (See, e.g., *San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal.App.4th 202, 231 (*San Francisco Baykeeper*) [declining request to take judicial notice of California Coastal Commission letter as not relevant]; *Roth v. Jelley* (2020) 45 Cal.App.5th 655, 678, fn. 10 [declining judicial notice request because the documents "are not relevant to the issues raised in this appeal"].)

4

directed staff "to convene a Technical Advisory Committee to advise on proposed amendments to Chapter 25B."  The Board planned to revisit the matter in six months (April 2023); however, to prevent "an undue rush on well permitting" during the intervening period, the Board imposed a temporary moratorium on new well permits from October 4, 2022, to April 2023, except for emergencies.

The Board convened a policy working group and a separate technical working group to report on the "best available science and policies for development of a well ordinance."  Members of the policy working group "represent[ed], solicit[ed], and integrate[d] community and stakeholder interests into recommendations on the revised well ordinance," while the technical working group "advise[d] on the analytical processes necessary to implement any potential policies," focusing on "technical development through data compilation, modeling, and other measures to better understand the interconnection of public trust surface waters and groundwater."

The working groups were comprised of scientific experts, public agencies, conservation groups, and community members, and each group considered and evaluated well classifications, monitoring and metering requirements, adverse impacts, conservation measures, and medium- and long-term policy options.  The working groups engaged in six independent meetings and three joint meetings between November 2022 and March 2023.  Additionally, the groups meet weekly with Matthew O'Connor, Ph.D., a hydrologist with O'Connor Environmental, Inc., who provided technical support services and helped working group members review and interpret hydrological data.

In March 2023, O'Connor issued a report, titled "Sonoma County Well Ordinance Public Trust Review Area Delineation" (the O'Connor report). The O'Connor report identified areas where groundwater pumping ("streamflow depletion") could affect navigable waters and salmonid habitats,[3] which it designated as "Public Trust Review Area" (PTRA). The PTRA was identified using a "risk-based approach" that considered "two primary factors": "Significant Resource Sensitivity" and "Significant Existing Streamflow Depletion." Waterways within Sonoma, including non-navigable waterways, were ranked from "low" to "high" or "very high" based on the sensitivity of the salmonid habitats and the level of existing streamflow depletion. Areas that ranked as "moderate risk" to "high risk" in *either* habitat value *or* streamflow depletion were included in the PTRA, while areas that were classified as "low risk" for *both* habitat value *and* streamflow depletion were excluded from the PTRA. In high risk areas, the PTRA included the entire sub-watershed "to be protective of both acute and cumulative streamflow depletion impacts." In moderate risk areas, the PTRA "consists of stream buffers," which are areas that extend anywhere from 100 feet to 750 feet from the stream based on "the transmissivity and storativity of the aquifer and the distance of the well from the stream."

Also in March 2023, the working groups issued an "Outcome and Recommendations Report" that provided "recommendations and options of *how*" Sonoma could satisfy its public trust obligations that included "[c]umulative impact considerations." Using the PTRA framework, the working groups recommended categorizing well permit applications by level

---

[3] Salmonids were used as "indicator species" because they are "sensitive to streamflow depletion" and "represent overall sensitivity of [public trust resources]."

of review; permits would be subject to either "ministerial (routine)" review or "discretionary (more tailored) review" based on location and well type. Wells outside of the PTRA would be subject to ministerial review. Wells within the PTRA would be subject to discretionary review unless the well "fit into defined ministerial well classes."

The working groups also recommended two levels of water conservation requirements that would be applicable to "[n]early all wells in the public trust review area," "except public water wells, which fall under local government and/or State Water Board jurisdiction." Additional metering and monitoring requirements were recommended "to increase data collecting to improve water use estimates."

After considering the working groups' recommendations and additional comments from the public, the Board adopted the proposed amendments on April 18, 2023. The Board did not conduct an independent environmental review under CEQA because it determined the Class 7, Class 8, and the common sense exemptions applied. (Cal. Code Regs., tit. 14,[4] §§ 15307, 15308, 15061, subd. (b)(3).)

**B. The Amendment of Chapter 25B[5]**

The purpose of the amendments, as stated in Chapter 25B, "is to protect the environment, public health and safety, and groundwater resource[s]" and "to address the County's public trust obligation." (Ch. 25B, § 25B-2, subds. (a), (b).) As amended, Chapter 25B provides: "All water well

---

[4] We refer to the CEQA guidelines (Cal. Code Regs., tit. 14, §§ 15000–15387) as the Guidelines.

[5] Further references and citations to Chapter 25B are to the version amended in 2023 unless otherwise noted.

applications shall be reviewed for potential adverse impacts on public trust resources, except as provided in this Chapter." (*Id.*, § 25B-4, subd. (d)(1).)

Adopting the PTRA framework set forth in the O'Connor report, Chapter 25B created a "Public Trust Review Area," which it defined as "the area estimated to be where the underlying aquifer is interconnected with navigable surface waters or a tributary stream that flows to a navigable water and which is based on available information indicating groundwater extraction may impact public trust resources including instream habitat of anadromous fish."[6] (Ch. 25B, § 25B-4, subd. (d)(2).)

Consistent with the working groups' recommendations, Chapter 25B created two categories of permit applications: "Discretionary" permit applications and "Ministerial" applications. (Ch. 25B, § 25B-5, subd. (d)(1), (2).) For discretionary permits, the applicant must provide "sufficient" information to determine whether issuing a permit will "cause or exacerbate a substantial adverse impact on public trust resources after imposition of feasible mitigation measures."[7] (*Id.*, § 25B-4, subd. (d)(3).) "Applications not subject to the [discretionary] public trust limitation are subject to ministerial review," meaning the application "shall be approved" if it otherwise complies with the Sonoma County Code. (*Id.*, § 25B-5, subd. (e)(1), (2).)

Certain categories of wells were "exempt from the discretionary public trust review," and thus subject to ministerial approval, because they pose a "low potential for impacts to public trust resources" or involve an "overriding

---

[6] Chapter 25B includes a "map of the Public Trust Review Area," which may be updated "[f]rom time to time," at the Board's discretion. (Ch. 25B, § 25B-4, subd. (d)(2).) As initially adopted, the PTRA "covers 313 square miles (19% of the County)."

[7] In their briefing to us, Keepers represent that the discretionary review process "is not at issue in this lawsuit."

8

public interest in favor of ensuring adequate water supply for existing and domestic uses." (Ch. 25B, § 25B- 4, subd. (e).) As relevant, these exemptions include: (1) "water well[s] outside the Public Trust Review Area"; (2) "Low Water Use" wells, "where the cumulative groundwater use from all wells on a parcel" is limited to two acre-feet per year (AFY), and the well owner complies with metering and monitoring requirements and Level 1 conservation measures[8]; (3) "Existing Use" wells, "where the cumulative groundwater use from all wells on the parcel" is limited to amounts historically used as of October 4, 2022 (the start of the mortarium), provided the owner complies with metering and monitoring requirements and Level 1 and 2 conservation measures[9]; and (4) "Net Zero Groundwater Increase" wells, "where the proposed use of water may increase but not result in a net increase in groundwater use from the local aquifer through implementation of water conservation measures . . . or participation in a streamflow augmentation project authorized by the California Department of Fish and Wildlife or National Marine Fisheries Service, provided that" the well complies with metering and monitoring requirements and Level 1 and 2

---

[8] Level 1 water conservation requirements include efficient faucets and showerheads; leak and water conservation audits; water efficient landscaping; a limit on "irrigated grass lawns"; disconnection of downspouts and redirection of roof rainwater to a location that "maximized infiltration and minimizes erosion"; and compliance with applicable water conservation requirements "that are consistent with or more protective than the requirements of this Chapter." (Ch. 25B, § 25B-13, subd. (b).)

[9] Level 2 water conservation requirements include efficient water closets and urinals; a water conservation plan "to reduce groundwater use to the maximum extent feasible" for commercial, industrial, and institutional sites; a conservation plan and "a frost protection plan" for agricultural sites using greater than two AFY of water; and "growing season" use limits for vineyards. (Ch. 25B, § 25B-13, subd. (a).)

conservation requirements, and the applicant demonstrates through a hydrogeologist prepared "groundwater recharge plan and report" that "enhanced ground water recharge" fully offsets "the proposed net increase in water extraction." (Ch. 25B, § 25B-4, subd. (e)(2), (6)–(8).)

To comply with the meeting and monitoring requirements, well owners were required to install, maintain, and report to Sonoma's "Permit and Resource Management Department" monthly readings from "totalizing water meters" that "measure[d] all groundwater extracted from the well," and monitor and report on "water levels within the well . . . at least monthly."[10] (Ch. 25B, §§ 25B-5, subd. (a); 25B-12, subd. (a).) Sonoma "anticipated" and "expected" that net groundwater use by existing users would decrease over time through the implementation of Level 1 and Level 2 conservation efforts but could not "quantify" any water savings due to "uncertainty" in its estimates.

Under the amended Chapter 25B, Sonoma retained the right to inspect well sites before and after permit issuance, to deny noncompliant applications, and to revoke or modify permits if "circumstances under which the permit was granted have changed and the public health, safety, and welfare require" or if the permitted work violated applicable ordinances. (Ch. 25B, §§ 25B-5, subd. (e)(7); 25B-10, subd. (d).) "Any interested person" could appeal the discretionary approval or rejection of a well application to the Board, which, if requested by the permitting agency, could approve a

---

[10] Certain wells were exempt from the metering and monitoring requirements. Wells that serviced a single parcel of land for solely residential purposes with a cumulative groundwater use of two acre-feet per year (AFY) or less of water were exempt from both the metering and monitoring requirements. (Ch. 25B, § 25B-12.) Wells with a "cumulative groundwater use of 5.0 acre-feet or less of water per year" were exempted from only the monitoring requirement. (*Id.*, § 25B-12, subd. (b).)

permit where the "overriding considerations that balance the protection of public trust resources with the health, safety and welfare needs of the community, including the need for drinking water" warranted. (*Id.*, § 25B-4, subd. (d)(6), (7).)

## II. Procedural Background

In May 2023, Keepers filed a petition for writ of mandate and declaratory and injunctive relief, seeking to invalidate the amended ordinance and enjoin Sonoma from issuing groundwater well permits. In August 2024, after briefing and a hearing on the merits, the superior court granted the petition in full. Specifically, the court found that the Keepers satisfied their burden of showing the amendments lacked evidence in support of the public trust because "there is no evidence or analysis supporting the Amendment and that such evidence or analysis is necessary in order to determine the efficacy of the Amendment's terms as well as what is feasible." The court further found that Sonoma failed to support its finding that the amended ordinance was exempt from CEQA review.

On October 30, 2024, the court entered judgment, setting aside the amendments to Chapter 25B, rescinding the categorical exemptions to CEQA review, and suspending the issuance of non-emergency well permits "unless and until [Sonoma] has complied with the requirements of the Public Trust Doctrine." Sonoma filed a notice of intent and motion for new trial, which the court denied.

Sonoma filed a timely notice of appeal from the October 2024 judgment.

## DISCUSSION

On appeal, Sonoma asserts three grounds for reversal. With regard to the public trust doctrine, Sonoma argues that we should "decline to follow" *Environmental Law Foundation* and reverse judgment because Keepers did

11

not satisfy their burden of proof in challenging the amended ordinance. Regarding CEQA, Sonoma claims that substantial evidence supports its determination that the amended ordinance is exempt from review and Keepers failed to demonstrate otherwise. Lastly, Sonoma argues the judgment must be reversed because it is procedurally and substantively defective.[11]

## I. Public Trust Doctrine

"The public trust doctrine has been part of California law since the state's admission to the Union in 1850." (*World Business Academy v. California State Lands Com.* (2018) 24 Cal.App.5th 476, 508 (*World Business Academy*); see also Pub. Resources Code, § 6009, subd. (a) ["California received title to the tidelands, submerged lands, and beds of navigable lakes and rivers . . . subject to the public trust"].) While initially dedicated to tidelands and navigable waters, the public trust doctrine now "extends to nontidal bodies such as inland waterways and lakes, the lands beneath them, as well as any streams and tributaries that affect any navigable waters." (*Personal Watercraft Coalition v. Marin County Bd. of Supervisors* (2002) 100 Cal.App.4th 129, 144 (*Personal Watercraft*).) Under the doctrine, the

---

[11] We granted leave for five amici curiae to submit briefs in support of the parties. In support of Sonoma, California Water Agencies and California State Association of Counties filed briefs generally arguing we should not follow *Environmental Law Foundation*. In support of Keepers, Environmental Law Foundation and California Law Professors argue in favor of following *Environmental Law Foundation*; California Law Professors also "explain[ ] the relevant legal standards" for reviewing compliance with the public trust doctrine but does not take a position on "whether [Sonoma] satisfied this duty." Each party submitted a consolidated brief in response to these amici. Additionally, Endangered Habitats League filed a brief in support of Keepers, arguing Sonoma failed to comply with CEQA, to which Sonoma responded in a separate brief.

state owns public trust resources " 'as trustee for public purposes' " and "has an obligation to regulate the use of these lands for the general benefit of the community." (*World Business Academy*, at p. 509.)

The public trust doctrine is "more than an affirmation of state power to use public property for public purposes." (*National Audubon*, *supra*, 33 Cal.3d at p. 441.) It also imposes an affirmative "duty . . . to protect the people's common heritage" and specifically "to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible." (*Id*. at pp. 441, 446 [requiring public agency to consider public trust in diverting water from streams running into Mono Lake].)

## A. *Environmental Law Foundation v. State Water Resources Control Board*

In *Environmental Law Foundation*, the Court of Appeal answered the "extraordinarily narrow" question of "whether the County and the Board have common law fiduciary duties to consider the potential adverse impact of groundwater extraction on the Scott River, a public trust resource, when issuing well permits." (*Environmental Law Foundation*, *supra*, 26 Cal.App.5th at pp. 851–852.) The *Environmental Law Foundation* court concluded the County of Siskiyou did bear such public trust duties but declined to "attempt to define the common law public trust duties of the Board or the County" in "any hypothetical factual scenarios." (*Id*. at p. 852.)

"Although the state as sovereign is primarily responsible for administration of the trust," *Environmental Law Foundation* held, "the county, as a subdivision of the state, shares responsibility for administering the public trust and 'may not approve of destructive activities without giving due regard to the preservation of those resources.' " (*Environmental Law Foundation*, *supra*, 26 Cal.App.5th at p. 868, quoting *Center for Biological*

13

*Diversity, Inc. v. FPL Group, Inc.* (2008) 166 Cal.App.4th 1349, 1370, fn. 19 (*Center for Biological Diversity*) ["If plaintiffs believe that the board of supervisors or any other agency or subdivision of the state has failed to discharge its responsibilities under the public trust, they may bring an appropriate action against those agencies"].)

We are not persuaded by Sonoma's argument that *Environmental Law Foundation* "is flat wrong." As Sonoma frames the issue, the state has "sole authority to administer the public trust," and "the only way that a county can 'share' in the State's responsibility to administer the public trust is if the Legislature expressly delegates its affirmative duty." "Such a delegation never occurred here," says Sonoma, which describes *Environmental Law Foundation* as "an anomaly" that we should not follow. Although not binding, "we ordinarily follow the decisions of other districts without good reason to disagree," and we see no reason to disagree with *Environmental Law Foundation.* (*Greyhound Lines, Inc. v. County of Santa Clara* (1986) 187 Cal.App.3d 480, 485.)

First, *Environmental Law Foundation* builds upon *Center for Biological Diversity*, *supra*, 166 Cal.App.4th at page 1369, in which Division Three of this appellate district explained that "plaintiffs have the right to insist that the state, through its appropriate subdivisions and agencies, protect and preserve public trust property." Notably, *Center for Biological Diversity* rejected the argument that Sonoma asserts in this appeal—"that the absence of legislation explicitly delegating to the counties the responsibility for enforcing the public trust over birdlife means that the Alameda County Board of Supervisors cannot be held accountable for authorizing conduct unjustifiably detrimental to these natural resources." (*Id.* at p. 1370, fn. 19.)

14

We disagree with Sonoma's attempt to minimize *Center for Biological Diversity*'s conclusion as dicta.  The Court of Appeal affirmed the dismissal of the public trust claim on the alternative ground that Alameda was "a necessary and indispensable party."  (*Center for Biological Diversity*, *supra*, 166 Cal.App.4th at p. 1372.)  "When an appellate court bases its decision on alternative grounds, none is dictum."  (*Greyhound Lines, Inc. v. County of Santa Clara*, *supra*, 187 Cal.App.3d at p. 485; *McClain v. Alameda County* (1962) 209 Cal.App.2d 73, 76 ["Where two independent reasons are given for a decision, . . . neither one is to be considered mere dictum"].)

Second, we are not persuaded by Sonoma's legal authority purportedly requiring a "delegation of the State's public trust obligations."  Sonoma claims, "California courts universally acknowledged the state as the sole trustee of the public trust doctrine," citing *Gray v. Reclamation Dist. No. 1500* (1917) 174 Cal. 622, 636; *Colberg, Inc. v. State ex rel. Dept. of Public Works* (1967) 67 Cal.2d 408, 416; *Personal Watercraft*, *supra*, 100 Cal.App.4th at page 145; and *National Audubon*, *supra*, 33 Cal.3d at page 424.  While these cases do recognize "[t]he supreme control of the state over its navigable waters" (*Gray*, at p. 636), it is in the context of other rights (e.g., the rights of private parties) "yield[ing] without compensation to a proper exercise of the power *of the state* over its navigable waters," which is "absolute except as limited by the paramount supervisory power of the federal government over navigable waters."  (*Colberg*, at pp. 416–417, citing *Gray*, at p. 637.)  Thus, the words "supreme" and "absolute" as used by *Gray*, at page 637, and *Colberg*, at page 416, are not reasonably construed as meaning "sole" or exclusive, as Sonoma argues.  Rather, supreme and absolute are more fairly read as meaning primary, as used in *Environmental Law Foundation*.  (*Environmental Law Foundation*, *supra*, 26 Cal.App.5th at p. 868 ["the state

15

as sovereign is *primarily responsible* for administration of the trust" (italics added)].)

Personal Watercraft, *supra*, 100 Cal.App.4th at page 146, also cited by Sonoma, rejected an argument analogous to the one Sonoma asserts here.  In *Personal Watercraft*, plaintiffs claimed that the state's public trust power was "exclusive," but the Court of Appeal clarified:  "The State may be preeminent, but it has not preempted the field to itself," and thus the plaintiffs "failed to persuade [the court] that the County usurped powers belonging solely to the State."[12]  (*Id*. at pp. 146, 153.)

Thus, *Gray*, *Colberg*, and *Personal Watercraft* stand for the same proposition acknowledged by *Environmental Law Foundation*:  "the state as sovereign is *primarily* responsible for administration of the trust." (*Environmental Law Foundation*, *supra*, 26 Cal.App.5th at p. 868, italics added.)  We reject the idea that the state cannot share public trust duties, because "shar[ing] responsibility for administering the public trust" (*ibid*.) is different from "abdication" of public trust rights and responsibilities (*Illinois Central Railroad v. Illinois* (1892) 146 U.S. 387, 452–453), or improper " 'delegat[ion]' " of those responsibilities by placing them " 'entirely beyond the direction and control of the State' " (*National Audubon*, *supra*, 33 Cal.3d at p. 438).

To the contrary, and consistent with *Environmental Law Foundation*, courts have recognized that "there may be circumstances in which [the public

---

[12] Sonoma argues, on reply, that "*Personal Watercraft* involved the very delegation by the Legislature to the county" that is presently missing. However, the statute at issue in *Personal Watercraft*, Harbors and Navigation Code section 660, defined the county's ability to regulate " 'vessels' " on its navigable waters much in the same way that Water Code section 13801 defines Sonoma's ability to regulate groundwater wells. (*Personal Watercraft*, *supra*, 100 Cal.App.4th at p. 146.)

trust] affirmative duty *also belongs* to other state agencies." (*Planning & Conservation League v. Department of Water Resources* (2024) 98 Cal.App.5th 726, 769, italics added.) In such circumstances, the duty "under the public trust doctrine is triggered . . . where [the county] is taking an action with an impact on public trust uses." (*Id.* at p. 770.) Accordingly, Sonoma's regulation of well permits "*carries with it* an 'affirmative duty to take the public trust into account.'" (*San Francisco Baykeeper*, *supra*, 242 Cal.App.4th at p. 234, italics added.)

Therefore, considering California case law on the public trust doctrine, we see no reason to depart from *Environmental Law Foundation*'s holding that counties like Sonoma "share[ ] responsibility for administering the public trust" with the state in permitting groundwater wells. (*Environmental Law Foundation*, *supra*, 26 Cal.App.5th at pp. 867–868.)

## B. Compliance with the Public Trust Doctrine

For its second argument, Sonoma asserts that Keepers did not show the amendment of Chapter 25B was arbitrary, capricious, or entirely lacking in evidentiary support. Considering the "deferential" standard of review and contours of the public trust doctrine, we agree with Sonoma. (*American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 461 (*American Coatings*); *National Audubon*, *supra*, 33 Cal.3d at p. 446 ["As a matter of practical necessity the state may have to approve appropriations despite foreseeable harm to public trust uses"].)

The parties dedicate large portions of their briefs to discussing the superior court's analysis. However, under the applicable standard of review, we "perform the same function" as the superior court and "therefore do not undertake a review of the [superior] court's findings or conclusions." (*Kahn v. Los Angeles City Employees' Retirement System* (2010) 187 Cal.App.4th 98,

105–106.)  Accordingly, our discussion begins with the appropriate standard of review and explains why Sonoma's amended ordinance withstands judicial scrutiny before turning to Keepers' arguments since Keepers bear the burden of proof in challenging the amendments.  (*Id.* at p. 106.)

"Code of Civil Procedure section 1085 permits judicial review of an agency's quasi-legislative act of adopting a regulation."  (*Western States Petroleum Assn. v. California Air Resources Board* (2025) 108 Cal.App.5th 938, 957.)  But to start, we must presume the legislative act is valid.  (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 509 (*San Francisco Tomorrow*).)  The legislative body " 'need not make explicit findings to support its action' " (*id.* at p. 509); instead, "to overcome the presumption of validity, the petitioner must produce evidence 'compelling the conclusion that the ordinance is, as a matter of law, unreasonable and invalid.' "  (*Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 993 (*Corona-Norco*).)

As the parties agree, " 'it is petitioner's burden to establish that [the county's] decision was arbitrary, capricious, *entirely lacking in evidentiary support*, unlawful, or procedurally unfair.' "  (*American Coatings*, *supra*, 54 Cal.4th at p. 460, italics added.)  Importantly, this "entirely lacking" standard of review " 'is not the same as a substantial evidence test' "; it "is more deferential to agency decisionmaking than the substantial evidence standard."  (*Id.* at p. 461.)  Indeed, review of "quasi-legislative acts are accorded the most deferential level of judicial scrutiny."  (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75 Cal.App.4th 1315, 1331, citing *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 575–576; see also *Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1266 [legislative acts entitled to deference include

18

"investigation and information gathering in aid of, or as a basis for, prospective legislation"].)

"Courts exercise limited review 'out of deference to the separation of powers between the Legislature and the judiciary.' " (*Carrancho v. California Air Resources Board*, *supra*, 111 Cal.App.4th at p. 1265, quoting *California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212.) Accordingly, courts " 'cannot inquire into the wisdom of a legislative act or review the merits of a local government's policy decisions.' " (*San Francisco Tomorrow*, *supra*, 229 Cal.App.4th at p. 509.) "If the record reflects ' "a reasonable basis for the action of the legislative body, and if the reasonableness of the decision is fairly debatable," ' " then a reviewing court will not disturb the legislative determination. (*Fair Education Santa Barbara v. Santa Barbara Unified School District* (2021) 72 Cal.App.5th 884, 895.) And, unless it is entirely lacking in evidentiary support, we will uphold a legislative act regardless of whether "there is evidence, even substantial evidence, supporting" an alternative decision. (*American Coatings*, *supra*, 54 Cal.4th at p. 475.)

In the public trust context, we have said there must be " 'full consideration of the state's public interest' " in any " 'action which will adversely affect traditional public rights in trust lands.' " (*Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1189.) However, "the concept of a public use is flexible, accommodating changing public needs"; thus, there is "no set 'procedural matrix' for determining" compliance with the doctrine. (*San Francisco Baykeeper*, *supra*, 242 Cal.App.4th at pp. 233–234.) "Indeed, imposing such procedural constraints would be inconsistent with the recognition that the state is free to choose between public trust uses" and "selecting one trust use 'in preference to . . . [an]other cannot reasonably be

19

said to be an abuse of discretion.' " (*Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 577, quoting *Higgins v. City of Santa Monica* (1964) 62 Cal.2d 24, 30.)

As our Supreme Court recognized in 1983, "[t]he population and economy of this state depend upon the appropriation of vast quantities of water for uses unrelated to in-stream trust values," and "[a]s a matter of practical necessity[,] the state may have to approve appropriations despite foreseeable harm to public trust uses." (*National Audubon, supra,* 33 Cal.3d at p. 446.) "The public trust resources therefore need not be protected under every conceivable circumstance, but only in those where protection or harm minimization is feasible." (*Monterey Coastkeeper v. California Regional Water Quality Control Bd., etc.* (2022) 76 Cal.App.5th 1, 21 (*Monterey Coastkeeper*).) Accordingly, "in carrying out the public trust doctrine," the state and counties may consider "conflicting policy concerns," including commerce, recreation, and environmental needs, and "fashion[ ] a compromise to address the practical realities." (*Carstens v. California Coastal Com.* (1986) 182 Cal.App.3d 277, 289–290.)

Here, we cannot say that Sonoma's amendments to the ordinance were arbitrary, capricious, or "entirely lacking in evidentiary support." (*American Coatings, supra,* 54 Cal.4th at p. 460.) To the contrary, the record demonstrates that Sonoma gathered information, engaged the public, and subsequently balanced "conflicting policy concerns and fashioned a compromise to address the practical realities" of groundwater well permitting. (*Carstens v. California Coastal Com., supra,* 182 Cal.App.3d at pp. 289–290.) This is the precise type of legislative discretion that is presumed valid, and Keepers do not overcome that presumption on this record.

20

We begin with the O'Connor report, which provides evidentiary support for Sonoma's decision to adopt the PTRA as "a process for consideration of impacts to public trust resources." The O'Connor report considered "many potential approaches to mapping the PTRA spanning a wide range of complexity and data requirements" and ultimately developed "risk-based approach . . . to define the PTRA" because it made "the best use of available data and numerical models" "given the data and implementation timeline constraints." The risk-based approach balanced two public trust concerns— "Streamflow Depletion" and "Resource Sensitivity"—by designating areas as either "high," "moderate" or "low" value (e.g., a "high value habitat" or a low streamflow depletion).

As for streamflow depletion, the O'Connor report specifically considered the best ways to measure both "cumulative streamflow depletion," which "occurs when the total volume of water pumped by a population of wells becomes significant relative to the total inflows to the aquifer," and "acute" streamflow depletion, which is the short-term depletion caused by individual well pumping. "There are many methods available for estimating streamflow depletion due to groundwater pumping," each with its own "distinct advantages and disadvantages"; however, under any approach "direct application . . . at the county-wide scale with limited time and resources is infeasible."

Therefore, the O'Connor report proposed "a relatively simple water balance method to estimate cumulative streamflow depletion that can be implemented across [Sonoma]." The O'Connor report validated this method against other models and confirmed it could consistently predict streamflow

21

depletion and was therefore "appropriate for [its] intended purpose of delineating areas with low, medium, or high streamflow depletion."[13]

"Resource sensitivity was mapped based on a combination of critical steelhead and coho habitat" from available information, including 2023 data from the California Department of Fish and Wildlife and 2012 data from the National Marine Fisheries Service. The high, medium, and low designations for resource sensitivity were reviewed by a "group of fisheries experts from National Marine Fisheries Service, California Department of Fish and Wildlife, Cal Trout, Sonoma Water, and Sonoma Ecology Center with detailed local knowledge of habitat conditions," and as a result, "a new 'Very High" sensitivity category was added."

To map the PTRA, the O'Connor report combined the rankings of streamflow depletion and resource sensitivity in a "matrix." The PTRA would include areas with high or very high habitat value, regardless of streamflow depletion, as well as areas with moderate habitat value, except where streamflow depletion was low. Areas with low habitat value were excluded from the PTRA regardless of streamflow depletion.

Based on the O'Connor report, Sonoma adopted the PTRA as a means of discharging its obligation to protect public trust resources. (Ch. 25B, § 25B-2, subd. (b).) Specifically, Sonoma found that the PTRA encompassed the areas where "groundwater extraction may impact public trust resources," and thus subjected those well applications to a heightened standard of review. (Ch. 25B, § 25B-4, subd. (d)(2).) In our opinion, the record demonstrates that Sonoma "considered the facts before it," "balanc[ed] . . .

---

[13] Further, "water use metering requirements associated with the new well ordinance would provide valuable data with which to refine estimates of existing groundwater pumping."

public trust rights . . . against the public need for [resources]," and enacted protections where feasible. (*World Business Academy*, *supra*, 24 Cal.App.5th at pp. 509–510.) Under the deferential standard of review, we cannot say the resulting amendments were arbitrary, capricious, or entirely lacking in evidentiary support.

To be sure, during the amendment process, Sonoma considered expanding the PTRA "to the entirety of the County" but rejected the proposal based on competing policy considerations. On the one hand, Sonoma found the "additional areas have low risk" of harming public trust resources while, on the other hand, expanding the PTRA would increase the costs of implementation.[14] Therefore, Sonoma determined "the additional costs for permitting and related requirements [were not] commensurate to the potential impact" on trust resources. Reviewing courts do not "second-guess" the reasonable exercise of legislative discretion under either the applicable standard of review or the public trust doctrine. (*American Coatings*, *supra*, 54 Cal.4th at p. 476; *Monterey Coastkeeper*, *supra*, 76 Cal.App.5th at p. 21 ["The public trust doctrine necessarily involves the exercise of discretion by state agencies"].)

Nevertheless, because Keepers bear the burden of proof in challenging the amended ordinance, we discuss their arguments. (*American Coatings*, *supra*, 54 Cal.4th at p. 460.) In this appeal, as they did in the superior court, Keepers assert Sonoma abused its discretion in amending Chapter 25B, including by adopting conservation measures and "ministerial" exceptions, without evidentiary support and without considering the cumulative impacts.

---

[14] The cost of conducting a public trust review was estimated to be "equivalent to 32 hours of staff time of an Engineer or Professional Geologist in the amount of $5,568" per application, and the well owner would bear the costs of preparing the permit application and supporting evidence.

As we discuss below, we believe these arguments require a level of scrutiny inconsistent with the applicable standard of review and, in any event, do not render Sonoma's decisions arbitrary, capricious, or without evidentiary support. (*American Coatings*, *supra*, 54 Cal.4th at p. 476 ["disagreement" with air protection measures did not provide a "basis for this court to second-guess the District's reasonable determinations"]; see also *Citizens for East Shore Parks v. State Lands Com.*, *supra*, 202 Cal.App.4th 549, 576 [rejecting argument that the agency had "an obligation to evaluate the other public trust uses urged by plaintiffs"].)

1. *Cumulative Impacts*

As an overarching claim, Keepers assert that Sonoma failed to account for "*future and existing* cumulative groundwater extractions." In support of their argument, Keepers point to internal comments that the "time constraints" forced working groups "to forgo review of important evidence, methodologies, and analyses before making recommendations."

Preliminarily, the record undercuts Keepers' claim that Sonoma failed to consider cumulative impacts. The working groups' report expressly included "Cumulative impact considerations," and the O'Connor report developed the PTRA in order to "estimate cumulative streamflow depletion [in a way] that can be implemented across the County."

While "the lack of data [was] a significant impediment to more robust technical approaches to evaluating impacts to public trust resources," to account for "groundwater pumping expansion and cumulative impacts," the working groups provided recommendations "to improve the data and information needed to more accurately evaluate" impacts on public trust resources. These recommendations were incorporated into the amended ordinance as metering and monitoring requirements. Thus, Sonoma

explicitly considered the cumulative impacts in amending Chapter 25B, and Keepers fail to overcome the presumption of validity. (*Corona-Norco*, *supra*, 17 Cal.App.4th at p. 993 [to overcome the presumption, the petition must produce evidence showing the amendment is "unreasonable and invalid" as a matter of law].)

Further, under the public trust doctrine, Sonoma is not required to protect resources in "every conceivable circumstance." (*Monterey Coastkeeper*, *supra*, 76 Cal.App.5th at p. 21.) In amending Chapter 25B, the Board took nearly a year, considering and revising the proposed amendments based on feedback from experts, working groups, interested stakeholders, and the public. While practical realities imposed some "time constraints [on] the ordinance development process," meaning some uncertainty was unavoidable, Sonoma made reasonable assumptions based on available data and planned to refine and "update" the review process and PTRA map based on the additional information received from the metering and monitoring requirements. Thus, Sonoma exercised reasonable legislative discretion in considering the evidence before it when amending Chapter 25B, and Keepers' cumulative impacts claim fails to justify judicial intervention under the public trust doctrine. (*Monterey Coastkeeper*, at p. 21 ["This inherently discretionary doctrine generally does not allow for intervention by the courts"].)

2. *Conservation Measures*

Additionally, Keepers claim, "Sonoma adopted the Conservation Requirements based on speculation that they would mitigate impacts, not on evidentiary support or analysis." But this argument flips the burden of proof. (*American Coatings*, *supra*, 54 Cal.4th at pp. 475–476 ["technical disagreements" "over how strict air pollution limits should be and how long

25

industry should have to achieve them" were insufficient to show amendments were arbitrary, capricious, "or without evidentiary support"].)

As stated earlier, we begin with the presumption that the legislation is valid and supported by the " 'necessary facts.' " (*Corona-Norco*, *supra*, 17 Cal.App.4th at p. 993.) Therefore, unlike CEQA, where an agency must offer substantial evidence in support of its findings (*California Farm Bureau Federation v. California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173, 185), here, Sonoma has no affirmative evidentiary burden to show the efficacy of the conservation measures. (See *Corona-Norco*, at p. 993 [petitioner bears the burden of overcoming the presumption of validity]; *American Coatings*, *supra*, 54 Cal.4th at p. 460 [" ' "the petitioner always bears the burden of proof in a mandate proceeding brought under Code of Civil Procedure section 1085" ' "].) Rather, Keepers "must produce evidence 'compelling the conclusion that the ordinance is, as a matter of law, unreasonable and invalid.' " (*Corona-Norco*, at p. 993.)

Keepers have not met that burden here. During the amendment process, the policy working group was tasked with considering conservation measures and agreed on the Level 1 and Level 2 conservation requirements. However, working group members were "evenly split" on types of wells to which each level would apply. Some members recommended the Levels 1 and 2 conservation requirements apply to new wells using less than two AFY of water while replacement wells would be exempt or subject to only Level 1 requirements; other members suggested Level 1 requirements apply to wells using less than half an AFY, while Levels 1 and 2 apply to wells using between half and two AFY.

Sonoma's decision to use the two AFY threshold was a reasonable exercise of its legislative discretion because it "considered [the] alternative"

and "nevertheless" adopted "the 2.0-acre-feet-per-year threshold for consistency with state law"[15] and because the more restrictive alternative "could have undue economic impact and substantially restrict many 'by right' land uses and the reasonable use of one's property, including use of water for human health and habitation." (See Ch. 25B, §§ 25B-12, 25B-13.)

At best, Keepers offer evidence that additional or different conservation measures may have provided greater protection to public trust resources, but "evidence, even substantial evidence, supporting a different categorization" is insufficient to defeat the amended ordinance as a whole. (*American Coatings*, *supra*, 54 Cal.4th at pp. 475–476.) Even under the public trust doctrine, Sonoma may "approve appropriations despite foreseeable harm to public trust uses." (*National Audubon*, *supra*, 33 Cal.3d at p. 446.)

3. *Ministerial Exceptions*

Keepers likewise claim, "Sonoma's establishment of ministerial well categories failed to consider all relevant factors and lacked evidentiary support." Keepers challenge Sonoma's finding of an "overriding public interest" justifying exemption from public trust review and cite comments from Sonoma's staff stating that the net zero increase well category needed "a lot of work . . . before it can be applied broadly."[16] Keepers' challenges again flip the burden of proof.

---

[15] As Sonoma explained during the amendment process, "California Water Code [section] 10721 defines 'de minimis extractor' as a person who extracts . . . less than 2.0 acre-feet per year for domestic purposes. The recent governor's executive order N-7-22 exempts permits for wells that will provide less than 2.0 acre-feet per year of groundwater for individual domestic users from additional requirements and review."

[16] Keepers also challenge the two AFY threshold with respect to the low use well category. As we have already discussed, adopting the two AFY threshold was a reasonable exercise of discretion. Moreover, the alternative proposal of a 0.5 AFY threshold was based on "the average groundwater use

Sonoma found that the ministerial categories were justified by two findings: "the low potential for impacts to public trust resources" and "the overriding public interest in favor of ensuring adequate water support for existing and domestic uses." (Ch. 25B, § 25B-4, subd. (e).) The low impact finding was supported by the O'Connor report, as discussed above, and the public interest is a policy consideration, the "wisdom" and " 'merits' " of which we " 'cannot' " review on appeal. (*San Francisco Tomorrow*, *supra*, 229 Cal.App.4th at p. 509.)

As for Keepers' challenge to the net zero use category, while Sonoma staff stated the category would require "a lot of work," the statement was made with respect to creating "objective standards" that could be "applied broadly," because until then, net zero use well permits would require preparation and review of a "recharge plan and report" prepared by a hydrogeologist, which could be costly.[17] (Ch. 25B, § 25B-4, subd. (e)(8)(ii).) Thus, the staff comment was not a criticism of the category as amended, but rather, a statement about future work to standardize the process and does not undermine Sonoma's legislative discretion.

---

of a rural single-family residence" per year. Thus, as a mathematical matter, adoption of the lower threshold would mean that that families using more than 0.5 AFY would be excluded from the low use category not based on unreasonable water use or threat to public trust resources, but because they happened to be above the average. Such a decision might very well "substantially restrict many 'by right' land uses and the reasonable use of one's property . . ." as Sonoma found.

[17] Although the well applicant would bear the costs of preparing the report, the discretionary review process was anticipated to cost Sonoma money and manpower, which provides a further rational basis for creating ministerial well categories.

In sum, applying the appropriate standard of review, we conclude Keepers do not satisfy their burden of demonstrating that Sonoma failed to consider the public trust doctrine in amending Chapter 25B.

## II. CEQA

CEQA "establishes a comprehensive scheme to provide long-term protection to the environment." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1092; see also *Sunflower Alliance v. Department of Conservation* (2026) 20 Cal.5th 22, 39–40.) Thus, CEQA and the Guidelines "establish a three-tier process to ensure that public agencies inform their decisions with environmental considerations." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380 (*Muzzy Ranch*).)

First, the agency determines whether the activity constitutes a "project" subject to CEQA's regulations. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380.) Second, the agency considers whether the project is "exempt" from CEQA review. (*Muzzy Ranch*, at p. 380.) If a project is exempt, then "no further environmental review is necessary"; however, if no exemption applies, then "the agency must 'conduct an initial study to determine if the project may have a significant effect on the environment.' " (*Id*. pp. 380–381.) Third, "if the agency determines substantial evidence exists that an aspect of the project may cause a significant effect on the environment," the agency must prepare an environmental impact report (EIR). (*Ibid.*) Here, we are concerned with the exemptions under the second step.[18]

---

[18] There are also "exceptions" to the "exemptions"; even if a project is categorically exempt from CEQA review, it "may nonetheless require review under CEQA if it falls within one of the *exceptions* to the *exemptions*." (*Robinson v. City and County of San Francisco* (2012) 208 Cal.App.4th 950, 956, italics added.) Here, Keepers asserted that the "cumulative impacts"

"In general, judicial review of agency actions for CEQA compliance extends to 'whether there was a prejudicial abuse of discretion.' " (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495.) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5; *Nassiri v. City of Lafayette* (2024) 103 Cal.App.5th 910, 920.)

Substantial evidence "means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) Substantial evidence includes "expert opinion supported by facts" but not [a]rgument, speculation, [or] unsubstantiated opinion or narrative." (*Id.*, § 15384, subds. (a), (b).)

"When an agency concludes an activity is exempt [from CEQA] based on factual considerations, a court reviews for substantial evidence. If the agency's determination 'involves pure questions of law, we review those questions de novo.' " (*Protecting Our Water & Environmental Resources v. County of Stanislaus*, *supra*, 10 Cal.5th at p. 495; see also *John R. Lawson Rock & Oil, Inc. v. State Air Resources Bd.* (2018) 20 Cal.App.5th 77, 103–104 [considering determination of baseline de novo].)

In amending Chapter 25B, Sonoma claimed the amendments were exempt from CEQA review under the Class 7 and Class 8 categorical exemptions, which exclude from CEQA review actions taken "to assure the maintenance, restoration, or enhancement of a natural resource" or "the

exception precluded Sonoma's reliance on categorical exemptions. Because we conclude Sonoma failed to support its claimed exemptions, we do not reach Keepers' asserted exceptions.

environment." (Guidelines, §§ 15307, 15308.) Additionally, Sonoma asserted the "common sense exemption" applied, which excuses CEQA review "[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment." (Guidelines, § 15061, subd. (b)(3).)

The superior court disagreed with Sonoma, concluding the "record demonstrates no substantial evidence" that the amended ordinance fell within either the categorical exemptions or the common sense exemption. The court reasoned that the baseline was the "moratorium on all new wells except for emergency permits, adopted in October 2022," and thus the amendments were "a 'relaxation' of" the environmental protection offered by the moratorium.

On appeal, Sonoma argues the superior court incorrectly determined the baseline, which should have been the ministerial well permitting in effect prior to the moratorium, and that substantial evidence supports the claimed exemptions. Although we agree the moratorium is the incorrect baseline, Sonoma still fails to show the claimed exemptions apply and are supported by substantial evidence.[19]

---

[19] Sonoma makes two additional arguments that we dispose of by way of footnote. First, Sonoma suggests that "Keepers waived the issue of whether there is substantial evidence supporting [Sonoma's] exemption conclusion" by failing to argue that substantial evidence was lacking in their respondent's brief. We decline to find waiver since Sonoma's only supporting authority states that an "*appellant's* failure to raise an issue in his or her opening brief" waives that challenge. (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685, italics added.) Although inadvisable, "even a respondent's *complete failure* to address an appellant's argument does not require us to treat the failure to respond as a concession the argument has merit." (*Griffin v. The Haunted Hotel, Inc.* (2015) 242 Cal.App.4th 490, 505.)

Second, Sonoma argues that the Level 1 and Level 2 conservation requirements are not "mitigation measures," as Keepers asserted below and

**A. Class 7 and Class 8 Categorical Exemptions**

Under CEQA, "the agency invoking the exemption has the burden of demonstrating it applies." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 386.) On review, we consider de novo whether the amended ordinance meets the definition of the asserted categorical exemption and, if so, we review the factual findings for substantial evidence. (*Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1251.) We "construe the exemptions narrowly in order to afford the fullest possible environmental protection." (*Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 697 (*Save Our Carmel River*).)

As noted above, the Class 7 and Class 8 categorical exemptions exclude from CEQA review actions taken "to assure the maintenance, restoration, or enhancement of a natural resource" or "the environment."[20] (Guidelines, §§ 15307, 15308.) "Case law is instructive as to which actions fall within these exemptions, and which do not. The prohibition of an activity that evidence shows is associated with 'environmental problems, [such as] the

_____

on appeal. (See also *Azusa Land Reclamation Co. v. Main San Grabiel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1199–1200 ["mitigation measures cannot be used to support a categorical exemption"].) We do not reach the argument, because even assuming the conservation requirements are permissible, Sonoma still fails to carry its burden of showing the exemptions apply and are supported by substantial evidence. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 386.)

[20] Notably, the concept of a baseline is not applicable to the Class 7 and Class 8 categorical exemptions. (*Save Our Big Trees v. City of Santa Cruz* (2015) 241 Cal.App.4th 694, 711 (*Save Our Big Trees*) ["whether the Project will have a significant effect on the environment is not the standard for determining whether it falls within a categorical exemption"; "the standard is whether substantial evidence supports the determination that the Project will assure the maintenance, restoration, or enhancement of the environment" or a natural resource].)

contamination of farmland,' constitutes an action to assure 'protection of the environment.' " (*Save Our Big Trees*, *supra*, 241 Cal.App.4th at p. 707.) "By contrast, actions that remove existing wildlife protections, authorize and regulate hunting, or relax existing environmental safeguards do not assure the maintenance, restoration, or enhancement of the environment." (*Id.* at p. 707.) "These legal guideposts indicate that" the Class 7 and Class 8 exemptions "embrace[ ] projects that combat environmental harm, but not those that diminish existing environmental protections." (*Ibid.*)

Here, as a matter of law, we fail to see how the amendments qualify as actions "to *assure* the maintenance, restoration, or enhancement" of the environment. (Guidelines, §§ 15307, 15308, italics added.) Rather, like in *Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 205, where the setting of hunting and fishing seasons was not categorically exempt as preserving natural resources; here, Chapter 25B regulates private activity that may have "an indirect beneficial effect on [natural resources]," but "cannot fairly or readily be characterized as a *preservation activity* in a strict sense."

Even assuming the amendments would have some beneficial impacts, Keepers note that the amendments also relax some regulations.[21] Thus, at best, the amended ordinance both strengthens and weakens environmental protections, which does not fall within the scope of the Class 7 or Class 8 categorical exemptions. (See also *Save Our Big Trees*, *supra*, 241 Cal.App.4th at pp. 707–713 [regulation of removal of trees not categorically exempt because, "Even assuming the [amendment] will not actually result in

---

[21] Prior to the amendment, Chapter 25B required destruction of an existing well upon completion of construction of a replacement well. However, the amended version of Chapter 25B provides 180 days for destruction, allowing for six months of joint use.

additional tree removals . . . , that does not render it an action to assure the maintenance, restoration, or enhancement of the environment"].)

Sonoma makes the feeble argument that the Class 7 and 8 exemptions "apply to 'action *taken* . . . to assure' environmental protection," which means the agency does not need "to prove the regulatory action will be 100 percent effective at all times," only that "the agency's objective intent and purpose" was to protect the environment. Sonoma's argument is inconsistent with CEQA's definition of substantial evidence, which excludes "unsubstantiated opinion" (Guidelines, § 15384, subd. (a)); case law, which deems an agency's intent "irrelevant" (*Save Our Big Trees*, *supra*, 241 Cal.App.4th at p. 710 [city's "intent . . . not to '*encourage*' tree removal" was "irrelevant"]); and the general policy of narrowly construing exemptions. (*Save Our Carmel River*, *supra*, 141 Cal.App.4th at p. 697.)

In any event, Sonoma also fails to support the asserted Class 7 or Class 8 exemptions with substantial evidence. Sonoma reasons that "because the Amendment creates protections where non previously existed," it is ipso facto exempt. We are unpersuaded. Sonoma received an average of anywhere from 280 to 320 well permits per year between 2017 and 2022. However, Sonoma estimated the amended ordinance's discretionary review process would apply to between five and 30 applications. Thus, according to Sonoma's own calculations, approximately 95 percent of applications would remain subject to ministerial review, meaning the amendments cannot be automatically assumed "to assure the maintenance, restoration, or enhancement" of the environment or a natural resource. (Guidelines, §§ 15307, 15308.)

As for the five percent subject to discretionary review, there is no evidence in the record that any permits would be denied in the review

process, and even if an application were denied, the applicant could appeal to the Board, which may, if requested by the enforcing agency, approve the application based on "overriding considerations that balance the protection of public trust resources with the health, safety and welfare needs of the community, including the need for drinking water." (Ch. 25B, § 25B-4, subd. (d)(6),(7).) Thus, it is speculative to assume that the amendments to Chapter 25B would result in any permit denials or fewer wells. (Guidelines, § 15384, subd. (a) ["Argument, speculation, [or] unsubstantiated opinion . . . does not constitute substantial evidence"].)

Further, there is no substantial evidence that the Level 1 and 2 conservation measures will maintain, restore, or enhance the environment or a natural resource. Although Sonoma "anticipated" and "expected" the conservation measures would "decrease" net groundwater use "over time," Sonoma acknowledged it could not "quantify" any benefits from the conservation measures because its estimates were subject to "quite a bit of err or uncertainty." Water conservation measures were also beyond the scope of the O'Connor report, which only noted in the introduction, "Additional review and water conservation requirements are intended to avoid or mitigate adverse impacts to [public trust resources]."

Thus, unlike our deferential review of the public trust claim where Sonoma was entitled to a presumption that it ascertained the necessary facts (*Corona-Norco*, *supra*, 17 Cal.App.4th at p. 993), under CEQA, Sonoma's "intent" to enhance the environment is not sufficient to satisfy its burden of proof. (*Save Our Big Trees*, *supra*, 241 Cal.App.4th at p. 710.) Sonoma's expectation or " 'understanding' " that the conservation requirements will reduce water use "does not amount to substantial evidence within the meaning of CEQA." (*Save Our Carmel River*, *supra*, 141 Cal.App.4th at

35

p. 698 [finding categorical exemption for replacement or reconstruction of existing facilities did not apply to approval of "water credit" transfer that allowed for additional water allocation at new construction site based on demolition of commercial building (and thus reduction in water use) at a different location].)

In short, Sonoma "bears the burden to demonstrate with substantial evidence" that the amended ordinance will restore or enhance the environment, and the CEQA challenger "bears no burden to show the Project will degrade the environment or deplete a natural resource." (*Save Our Big Trees*, *supra*, 241 Cal.App.4th at pp. 710–711.) Assuming the Class 7 and Class 8 exemptions are applicable, the record does not contain substantial evidence that the amendments to Chapter 25B are actions "to assure the maintenance, restoration, or enhancement of a natural resource" or "the environment." (Guidelines, §§ 15307, 15308.)

## B. Common Sense Exemption

A project that does not qualify for a categorical exemption "may nonetheless be found exempt under what is sometimes called the 'commonsense' exemption, which applies '[w]here . . . there is no possibility that the activity in question may have a significant effect on the environment.' " (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380, quoting Guidelines, § 15061, subd. (b)(3).) "There is no 'ironclad definition of [what constitutes a] significant effect.' " (*Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 729.)

Under the common sense exemption, if "there is a reasonable possibility that a proposed project will have a significant effect upon the environment, then the lead agency must conduct an initial study." (*California Farm Bureau Federation v. California Wildlife Conservation Bd.*,

36

*supra*, 143 Cal.App.4th at p. 194, italics omitted.) "A remote or outlandish possibility of an environmental impact will not remove a project from the commonsense exemption, but if legitimate, reasonable questions can be raised about whether the project might have a significant impact, the agency cannot find with certainty the project is exempt." (*Id.* at p. 194.) Thus, the common sense exemption "is 'reserved for those "obviously exempt" projects, "where its absolute and precise language clearly applies." ' " (*Ibid.*)

In considering whether the common sense exemption applies, courts have considered the relevant baseline. (See, e.g., *CREED-21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 504–507, 510–513 [finding trial court applied improper baseline in considering common sense exemption].) Thus, we begin by addressing the correct baseline, which is "the *actually* existing physical conditions" when the environmental analysis is commenced, and not the "*hypothetical* conditions that could have existed under applicable permits or regulations." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 448 (*Neighbors*).) The term "baseline" comes from the Guidelines on contents of an EIR, which must include "a description of the physical environmental conditions" in order to evaluate whether the project will have a significant impact on the environment.[22] (See Guidelines, § 15125, subd. (a); see also *North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 872.)

While the agency "enjoy[s] discretion . . . related to the choice of a measurement technique for existing conditions," it is required to measure the "existing conditions baseline." (*Neighbors, supra*, 57 Cal.4th at p. 449.)

_____

[22] " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project." (Guidelines, § 15382; see also Pub. Resources Code, § 21083, subd. (b).)

37

Therefore, applicable regulations may be informative in measuring existing conditions, but they cannot supplant "recent history of *actual*[ ]" use. (*North County Advocates v. City of Carlsbad* (2015) 241 Cal.App.4th 94, 105.)

Here, not only did Sonoma's amendment process begin before the moratorium was adopted, but the moratorium represents the then-current regulatory scheme, not "the *actually* existing physical conditions," making the number of well permits issued during the moratorium an improper baseline. (See *Neighbors*, *supra*, 57 Cal.4th at pp. 448, 450 [approving "a realistic measure of existing conditions" as "water allocation approximating the property's recent historical use"], citing *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 336–340 [approving baseline based on 2004 groundwater use while property operated as an egg farm, notwithstanding cessation of operations in 2005, where environmental study began in December 2004].) As Keepers suggest, the baseline is more appropriately measured by the number of existing wells prior to the moratorium, "their annual water usage, and the resulting groundwater and streamflow conditions."[23]

---

[23] Keepers suggest that that "prior illegal conduct" cannot serve as the existing conditions, and thus "Sonoma's past failure to comply with the Public Trust Doctrine" cannot serve as the baseline. Keepers' cited case law, however, undermines their argument. In *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1453, the Court of Appeal determined CEQA was not the appropriate vehicle for adjudicating prior illegal activity: "Because the prior illegality was subject to enforcement actions . . . , CEQA did not require any further accounting for prior activity at or within the vicinity of the project." And *Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1188, 1197, expressly considered the prior illegal activity (i.e., the de facto policy of "non-enforcement" of leash laws) in finding the city failed to adequately analyze the potential for "increases in such off-leash dog use" caused by "the policy change" of removing the leash requirements altogether. Therefore, we do not pass on the validity of the pre-

However, regardless of the baseline, Sonoma offers no substantial evidence in support of the common sense exemption. As discussed above, any assumption that the amended ordinance will result in fewer wells or a decrease in water use is not supported by substantial evidence. Thus, it cannot be said "with certainty" that the amendments have "no possibility" for causing a significant effect on the environment. (Guidelines, § 15061, subd. (b)(3).)

Therefore, Sonoma fails to offer substantial evidence that either common sense exemption or the Class 7 or 8 categorial exemptions excuse the amended ordinance from CEQA review.[24]

In conclusion, we reverse the judgment in part and affirm in part.[25] Insofar as the judgment issued a peremptory writ of mandate and ordered Sonoma to set aside and void the amended ordinance under the public trust doctrine, the judgment is reversed; the amendments are not void. Insofar as

amendment Chapter 25B in concluding the moratorium is the incorrect baseline.

[24] Although we conclude Sonoma has failed to comply with CEQA, we note that such noncompliance does not "undermine[ ] the otherwise facially adequate public trust doctrine analysis." (*World Business Academy*, *supra*, 24 Cal.App.5th at p. 510.) We also express no opinion as to the manner in which CEQA should be complied with or whether any moratorium or intervening measures concerning non-emergency well permits are appropriate.

[25] Because we reverse in part, we do not address Sonoma's arguments regarding its objections to the judgment, which, as Keepers correctly argue, were untimely. (Cal. Rules of Court, rule 3.1590(j); *In re Marriage of Steiner & Hosseini* (2004) 117 Cal.App.4th 519, 524 [applying 10-day limit under a prior version of Cal. Rules of Court, rule 3.1590 to a proposed judgment]; see also *In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 346 ["Because he did not raise the issue [about the judgment] in the trial court, [appellant] forfeited his right to complain on appeal about the trial court's lack of specificity"].)

the judgment rescinded the notice of categorical exemption issued in connection with the adoption of the amendment of Chapter 25B, the judgment is affirmed.

On remand, the court is directed to vacate its October 30, 2024 judgment and November 15, 2024 writ of mandate and enter a new judgment denying Keepers' petition for writ of mandate insofar as it challenges the amended ordinance under the public trust doctrine.[26]

## DISPOSITION

The judgment is affirmed in part and reversed in part, and the matter is remanded to the superior court to enter a new judgment consistent with this opinion. Each party to bear their own costs of appeal.

---

[26] Given our partial reversal, the court may reconsider whether Keepers are the prevailing party entitled to costs and/or attorney's fees.

DESAUTELS, J.

We concur:

RICHMAN, ACTING P.J.

MILLER, J.

*Russian Riverkeeper et al. v. County of Sonoma* (A172760)

| | |
|---|---|
| Trial Court: | Sonoma County Superior Court |
| Trial Judge: | Hon. Bradford DeMeo |
| Attorneys for Defendant and Appellant County of Sonoma: | Best Best & Krieger LLP<br>Scott W. Ditfurth<br>Amy E. Hoyt<br>Patricia Ursea<br>Zachary N. Scalzo |
| Amicus Curiae on behalf of Defendant and Appellant County of Sonoma: | BKS Law Firm PC<br>Kristin B. Peer<br>Jennifer T. Buckman<br>Ryan S. Bezerra<br>Robert G. Putka<br>for Association of California Water Agencies<br><br>Downy Brand LLP<br>Austin C. Cho<br>for California State Association of Counties |
| Attorneys for Plaintiffs and Respondents Russian Riverkeeper and California Coastkeeper Alliance: | Carsten, Black & Minteer, LLP<br>Michelle N. Black<br>Amy C. Minteer<br><br>Sycamore Law, Inc.<br>Daniel Cooper<br><br>Drevet Hunt<br>Jaime Neary |
| Amicus Curiae on behalf of Plaintiffs and Respondents Russian Riverkeepers and California Coastkeeper Alliance: | Shute Mihaly & Weinberger, LLP<br>William J. White<br>Winter King<br>Aidan Freeman<br>for Endangered Habitats League<br><br>Environmental Law Clinic, Mills Legal at Stanford Law School |

43

Deborah A. Sivas
Amanda D. Zerbe
Matthew J. Sanders
for California Law Professors

Nathaniel H. Kane
James R. Wheaton
Lowell K. Chow
for Environmental Law Foundation